## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SETH R. NIEMAN | ) |
| TONY F. NIEMAN | ) |
| JAYNE M. NIEMAN | ) |
| | ) |
| NATE P. SCHULER | ) |
| JAMIE L. SCHULER | ) |
| | ) |
| CODY A. VERTZ | ) |
| BREANNA M. VERTZ | ) |
| | ) |
| OWEN LAWLOR | ) |
| MARGARET LAWLOR | ) |
| | ) |
| CORBIN M. MCCLANAHAN | ) |
| | ) |
| (Addresses filed under seal) | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE ISLAMIC REPUBLIC OF IRAN, | ) |
| c/o Hossein Amir-Abdollahian | ) |
| Ministry of Foreign Affairs | ) |
| Imam Khomeini Street | ) |
| Imam Khomeini Square | ) |
| Tehran, Iran | ) |
| | ) |
| Defendant. | ) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>COMPLAINT</u>

Plaintiffs, by and through their undersigned counsel, seek judgment against Defendant, the Islamic Republic of Iran, pursuant to the Foreign Sovereign Immunities Act, as amended, 28 U.S.C. § 1605A.

## I.  **INTRODUCTION**

1.      This action is brought by plaintiffs through counsel against the Islamic Republic of Iran (hereinafter "Iran") by members of the U.S. armed forces targeted and wounded by terrorists operating with the material support and resources provided by Iran while deployed in Afghanistan, and their respective immediate family members.

2.      During all times relevant hereto, Iran sponsored the leading terrorist organizations active in Afghanistan, including the Taliban and al-Qaeda, in an effort to undermine American foreign policy in the region, and expel American forces from Afghanistan.  The material support and resources provided by Iran to these terrorist organizations in furtherance of their terrorist attacks in Afghanistan included, *inter alia*, weaponry, financing, safe haven, safe passage, training, and assistance in executing attacks that injured plaintiffs.

## II.  **JURISDICTION AND VENUE AND CHOICE OF LAW**

3.      Jurisdiction in this Court arises pursuant to 28 U.S.C. §§ 1605A, 1330(a), 1331, and 1332(a)(2).

4.      Defendant Iran  is subject to suit in the courts of the United States as a sponsor of the terrorist groups the Islamic Revolutionary Guard Corps-Qods Force, and the Taliban, pursuant to the Foreign Sovereign Immunities Act, as amended, 28 U.S.C. § 1605A(a), and related statutes, including Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j), Section 40 of the Arms Export Control Act (22 U.S.C. § 2780), and Section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), which designated Iran as a state sponsor of terrorism.

5.      28 U.S.C. § 1605A provides a federal private right of action against foreign state sponsors of terror for personal injury or death caused by acts of terrorism and providing for

damages including economic damages, solatium, pain and suffering, and punitive damages. 28 U.S.C. § 1605A(c).

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).  Actions for personal injury, death, and related torts perpetrated by foreign state sponsors of terrorism through their officials, employees, and agents fall within the meaning of 28 U.S.C. § 1605A generally.

### III.    PARTIES

#### A.  PLAINTIFFS

7.      Plaintiff **Seth Robert Nieman** is a United States citizen.  At the time of the acts alleged herein, he was a United States citizen and a Captain in the United States Army stationed at Fort Bragg, North Carolina, serving as a Special Forces Officer with the 3rd Special Forces Group, deployed to Afghanistan.  On or about November 27, 2012, he was injured in the Jalrez district of the Wardak province of Afghanistan when he was attacked by an Iranian-made and/or supplied terrorism-related explosive device and machine gun fire.  As a result of the attack, he suffered severe injuries to his legs, including an amputation of his right leg below the knee, a fractured lumbar spine, traumatic brain injury, migraines, shrapnel injuries, fractured teeth, hearing loss, and PTSD.

8.      Plaintiff **Tony Francis Nieman** is a United States citizen.  He is the father of Plaintiff Seth Nieman. As a result of the attack and injuries sustained by his son, Tony has experienced severe emotional distress, shock, extreme mental anguish, pain and suffering, loss of solatium, and loss of society and companionship.

9.      Plaintiff **Jayne Marie Nieman** is a United States citizen.  She is the mother of Plaintiff Seth Nieman.  As a result of the attack and injuries sustained by her son, Jayne has

experienced severe emotional distress, shock, extreme mental anguish, pain and suffering, loss of solatium, and loss of society and companionship.

10.     Plaintiff **Nate Pierce Schuler** is a United States citizen.  At the time of the acts alleged herein, he was a United States citizen in the United States Army stationed at Fort Bragg, North Carolina, serving as a Weapons Sergeant with the 3rd Special Forces Group, deployed to Afghanistan.  On or about November 27, 2012, he was injured in the Jalrez district of the Wardak province of Afghanistan when he was attacked by an Iranian-made and/or supplied terrorism-related explosive device and machine gun fire.  As a result of the attack, he suffered severe injuries, including multiple fractures of his left leg, a broken right hand, a broken right wrist, and traumatic brain injury.

11.     Plaintiff **Jamie Lee Schuler** is a United States citizen.  She is the wife of Plaintiff Nate Schuler.  As a result of the attack and injuries sustained by her husband, she has experienced severe emotional distress, shock, extreme mental anguish, pain and suffering, loss of solatium, and loss of society and companionship.

12.     Plaintiff **Cody Allen Vertz** is a United States citizen.  At the time of the acts alleged herein, he was a United States citizen and an Infantryman serving with the 3rd Infantry Division 1st Armored Brigade Combat Team in the United States Army, stationed at Fort Stewart, Georgia, deployed to Afghanistan.  On or about November 27, 2012, he was injured in the Jalrez district of the Wardak province of Afghanistan when he was attacked by an Iranian-made and/or supplied terrorism-related explosive device and machine gun fire.  As a result of the attack, he suffered traumatic brain injury, a broken ankle, migraine headaches, back and neck pain, PTSD, depression, and anxiety.

4

13.     Plaintiff **Breanna M. Vertz** is a United States citizen.  She is the wife of Plaintiff Cody Vertz.  As a result of the attack and injuries sustained by her husband, she has experienced severe emotional distress, shock, extreme mental anguish, pain and suffering, loss of solatium, and loss of society and companionship.

14.     Plaintiff **Owen Lawlor** is a United States citizen.  At the time of the acts alleged herein, he was a United States citizen and a Master Sergeant in the United States Army stationed at Fort Bragg, North Carolina, serving with the 3rd Special Forces Group, deployed to Afghanistan. On or about October 5, 2012, and March 11, 2013, he was injured in the Wardak province of Afghanistan, when he was shot multiple times by Iranian-supplied machine gun fire. He sustained gunshot wounds to his face, stomach, hips and lower limbs.  As a result of the attacks, he suffered permanent vision loss to his left eye, an amputation below his left knee, PTSD, depression and anxiety.

15.     Plaintiff **Margaret Lawlor** is a United States citizen.  She is the daughter of Plaintiff Owen Lawlor.  As a result of the attack and injuries sustained by her father, she has experienced severe emotional distress, shock, extreme mental anguish, pain and suffering, loss of solatium, and loss of society and companionship.

16.     Plaintiff **Corbin Michael McClanahan** is a United States citizen.  At the time of the acts alleged herein, he was a United States citizen and a Combat Engineer serving with the 162nd Engineer Company in the United States Army stationed with the Oregon National Guard in Salem, Oregon, deployed to Afghanistan.  He was severely injured when he was struck by an Iranian-made and/or supplied terrorism-related explosive device in five separate terrorist attacks in the Helmand province in Afghanistan between April 2010 and August 2010.  As a result of these

terrorist attacks, Corbin suffered concussions, traumatic brain injury, post-concussive headaches, shrapnel injuries, injuries to his knees, back, face and shoulder, hearing loss and PTSD.

**B.  DEFENDANT**

17.     Defendant Iran is a foreign state within the meaning of 28 U.S.C. § 1391(f) and has been designated a state sponsor of international terrorism by the U.S. Department of State pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)), Section 40 of the Arms Export Control Act (22 U.S.C. § 2780), and Section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371) continuously since January 19, 1984.  Iran provided material support and resources to the Islamic Revolutionary Guard Corps-Qods Force and the Taliban, within the meaning of 18 § U.S.C. 2339A.   Iran is a foreign state within the meaning of 28 U.S.C. § 1391(f).

18.     A division of Iran's government, the Islamic Revolutionary Guard Corps (IRGC), employs terrorism to pursue Iran's strategic objectives worldwide, through the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF), its elite special operations unit, which arms, funds, trains and directs terror proxies.

19.     The IRGC is a non-traditional agency or instrumentality of Iran.  It is the military arm of a kind of shadow government answering directly to the Ayatollah and the mullahs who hold power in Iran. It is similar to the Nazi party's SA organization prior to World War II. It has its own separate funding sources, derived from confiscation of the assets of the former Shah of Iran in 1979, when the Shah was deposed.

20.     The IRGC, with its own separate ministry, has evolved into one of the most powerful organizations in Iran and functions as an intelligence organization, both within and beyond Iran's borders. The IRGC exerts considerable influence on the government policies of Iran.

It has become a powerful military instrument for defending and furthering Iran's Islamic fundamentalist revolution and is dedicated to the export of Islamic fundamentalist principles throughout the world through acts of terrorism.  The IRGC actively supports terrorism as a means of protecting the Islamic revolution that brought the Ayatollah to power in Iran in 1979.

21.    The U.S. Department of the Treasury formally designated the IRGC-QF as a Specially Designated Global Terrorist Entity (SDGTE) under Executive Order 13224 for its support of a number of terrorist groups on October 25, 2007, and in April 2019, the Secretary of State designated the IRGC, including the Qods Force, as a Foreign Terrorist Organization.  In making the SDGTE designation, the Treasury Department specifically cited to the Qods Force support of the Taliban:

> The Qods Force is the Iranian regime's primary instrument for providing lethal support to the Taliban. The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan.  Since at least 2006, Iran has arranged frequent shipment of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and probably man-portable defense systems to the Taliban.  This support contravenes Chapter VII UN Security Council obligations.  UN Security Council resolution 1267 established sanctions against the Taliban and UN Security Council resolutions 1333 and 1735 imposed arms embargoes against the Taliban. Through Qods Force material support to the Taliban, we believe Iran is seeking to inflict casualties on U.S. and Nato forces.[1]

22.    The IRGC-QF, acting as an agent of Iran, performed acts within the scope of its agency - and within the meaning of 28 U.S.C. § 1605A and § 1605A note – in providing arms, funds, training, and direction to the Taliban for its terrorist activities, including the terrorist attacks in which the plaintiffs were physically injured, and which inflicted extreme mental and emotional anguish on their immediate family members.

---

[1] U.S. Treasury Dept. Press Release hp-655, Designation of Iranian Entities and Individuals for Proliferation Activities and Support of Terrorism (Oct. 25, 2007), https://home.treasury.gov/news/press-releases/hp644

## IV.    STATEMENT OF FACTS

### A.  Iranian Material Support of Terrorism

23.     In 1979, the Islamic Republic of Iran came to power both through a popular revolution and then through a series of referenda.  This government replaced the previous regime, which was headed by Shah Mohammad Reza Pahlavi.

24.     From the beginning, Iran's political and religious institutions were overseen by a single person, who was called "the Supreme Leader."

25.     The philosophy of government has prevailed since the early days following the revolution and continues through the current day.  In this philosophy, the Supreme Leader is acting as the earthly representative for the "hidden imam," who will return one day at the end of days.

26.     In the hidden imam's absence, the Supreme Leader has the authority to make any decision – be it religious or political.  The Iranian Constitution provides that the Supreme Leader has the authority to dismiss the Iranian President, overrule the parliament and the courts, and overrule any secular law.  In addition, the Supreme Leader is imbued by the religious community with the authority to overrule any religious law if necessary for the "expediency of the system." Indeed, under the Constitution, the Supreme Leader appoints an Expediency Council to advise and assist him in overriding any law, civil or religious, which is found inexpedient.

27.     At the time of the 1979 revolution, Ayatollah Ruhollah Khomeini was the Supreme Leader. Currently, the Supreme Leader is Ayatollah Ali Khamenei.  He is the only person, other than Ayatollah Khomeini, to hold the title of Supreme Leader.

28.     The Supreme Leader is not popularly elected.  He is chosen by an "Assembly of Experts," the members of which, in theory, are popularly elected.  In fact, however, all candidates

must be approved by the previous Supreme Leader. That makes the selection of the Supreme Leader rather like the election of a Pope by the College of Cardinals.

29.     The Islamic Republic of Iran's political structure is bifurcated into two aspects: 1. A formal governmental structure; and 2. A revolutionary structure.  The Supreme Leader oversees both aspects.

30.     Iran's President is subordinate to the Supreme Leader, but otherwise leads Iran's formal governmental structure.

31.     The Supreme Leader oversees the revolutionary structure, which includes entities, some of which are described herein, that are parallel to the traditional government agencies within the formal government structure.  For example, IRGC is parallel to the regular military of Iran. There are revolutionary courts that are parallel to the regular courts of Iran.  However, in each case, the revolutionary institution is the more powerful of the pair.

32.     The IRCG was established in the immediate wake of the 1979 revolution. Its role is built into Iran's constitution as defenders of the revolution – not just defenders of Iran as a country, but defenders of the 1979 revolution. The IRGC is one of the major organizations through which Iran has historically carried out its support for terrorism.

33.     From its creation through the present day, the IRGC has been directly controlled by the Supreme Leader. It has not reported, in any way, to the President or Parliament.

34.     Among its other tasks, the IRGC is dedicated to the spread of fundamentalist Islamist principles throughout the world, and the establishments of fundamentalist Islamist governments in nations other than Iran.  The Qods Force is the branch of the IRGC generally charged with "foreign operations."

35.     The foreign operations IRGC-QF supports include foreign insurgents and terrorists such as those fighting U.S. forces and U.S.-backed governments in Afghanistan and Iraq. IRGC-QF is the principal Iranian organization working with the Lebanese Hezbollah organization's armed elements, which carry out terrorist operations worldwide, engage in military operations in Syria in support of the Assad regime's battle against insurgents, and prepare for battle against Israel.

36.     It has been well-documented for over twenty years that the IRGC has historically provided funding and/or training for terrorism operations that targeted United States and Israeli citizens.  Such activities have included support for al-Qaeda, including its operations through AQI/ISI in Iraq.

37.     Although they have a long history of cooperating in a common anti-American agenda, Iran and al-Qaeda have always had serious ideological differences.  In providing support to al-Qaeda, the Taliban and Hezbollah, the IRGC, including the IRGC-QF division, is acting as an official agency whose activities are tightly and carefully controlled by the Iranian government through the Supreme Leader and his representatives.

38.     Iran has long provided support -through the IRGC-QF and Hezbollah – for terrorist attacks against American military forces and contractors.  For example, Iran used the IRGC and Hezbollah to train, guide, direct and motivate Shi'a terrorists targeting American service members and civilians in Iraq. Similarly, Iran (acting predominantly through Hezbollah) provided Iraqi terrorists with explosively formed penetrators, a weapon that inflicted more casualties on Americans than any other in Iraq.

**B.  Iran's Material Support to the Taliban in Afghanistan**

39.     In the years prior to the U.S. invasion in Afghanistan, Iran's relationship with the Taliban was explicitly hostile.  In the aftermath of the September 11, 2001 attacks and the U.S. invasion of Afghanistan, Iran initially emerged in the open as a U.S. ally in confronting the Taliban, but covertly was already seeking to undermine the U.S.

40.     In February 2002, then-CIA Director George J. Tenet testified before Congress that "initial signs of Tehran's cooperation and common cause with us in Afghanistan are being eclipsed by Iranian efforts to undermine U.S. influence there.  While Iran's officials express a shared interest in a stable government in Afghanistan, its security forces appear bent on countering the US presence."

41.     That dynamic took a turn for the worse in 2005 when it became clear that the U.S. and its NATO allies had no intention of militarily departing Afghan soil and as U.S.-Iranian ties were rapidly deteriorating into hostility in Iraq.

42.     It was thus in 2005 that Iran entered into a relationship of mutual interest with the Taliban.  Iran sought to bleed the U.S. in Afghanistan by enhancing Taliban capabilities, to protect pre-existing Iranian interests, and to influence the trajectory of the conflict and the politics surrounding the situation in Afghanistan.

43.     Although there are religious differences between the Shiite Iranian regime and the Sunni Taliban organization, those differences have not deterred Iran from supporting the Taliban's terrorist activities.  Iran and the Taliban share a core geopolitical aim:  to inflict mass casualties on Americans.  As a Taliban commander stated in 2010 of Iran, "Our religions and our histories are different, but our target is the same – we both want to kill Americans."

44.     In the initial years of Iran's provision of assistance to the Taliban, the assistance came solely in the form of weaponry.  The relationship was managed by the IRGC-QF.

45.     The first public accusation of Iran having provided weapons to the Taliban came in April 2007, when the U.S. Department of Defense announced having captured near the Iranian border with Afghanistan a shipment of Iranian-manufactured weapons – mortars and plastic explosives containing markings identifying them as Iranian-made – destined for the Taliban.

46.     This public revelation appeared to align with a marked increase in Iranian assistance to the Taliban – and consequently, appeared to play a role in catalyzing a consistent escalation in Taliban attacks across Afghanistan for years to come.

47.     The following month, the U.S. and U.K. militaries reported another seizure, containing Iran-made KL-7.62 rifles, plastic explosives, mortars, ammunition and at least one explosively-formed penetrator (EFP) bomb.  EFPs were a weapon that Iran had inserted into the conflict in Iraq, providing Qods Force Shi'a militia proxies with them in large numbers, as well as with the expertise to manufacture their own.

48.     An EFP is an adapted improvised explosive device (IED) designed to detonate and propel a shaped charge towards the intended target, piercing and penetrating thick armor.  In Iraq and later in Afghanistan, Iran-linked EFPs emerged as amongst the most deadly and potent weapons used against U.S. and allied forces.  Once Iran had begun providing them to the Taliban, they earned the nickname "Dragon" amongst Taliban fighters.

49.     In the months and years that followed, the U.S. military and other NATO allies captured a large number of Iranian weapons shipments and Iranian-made weapons.  Some notable seizures as well as associated public statements on the issue:

    a.  **June 4, 2007**: U.S. Defense Secretary Robert Gates says: "there have been indications over the past few months of weapons coming in from Iran… clearly

there is evidence that some weapons are coming into Afghanistan destined for the Taliban."

b.  **June 13, 2007**: U.S. Defense Secretary Robert Gates says: "[It is] pretty clear there's a fairly substantial flow of weapons [from Iran to the Taliban]… given the quantities we're seeing, it is difficult to believe it's… taking place without the knowledge of the Iranian government."

c.  **June 13, 2007**: U.S. Undersecretary of State Nicholas Burns says: "There's irrefutable evidence the Iranians are" [providing arms to the Taliban]… and it's a pattern of activity. It's certainly coming from the government of Iran. It's coming from the Iranian Revolutionary Guard Corps command, which is a basic unit of the Iranian government."

d.  **Mid-2007:** An Afghan National Police (ANP) commander responsible for Herat, Farah and Badghis provinces claimed that his forces had caught two pick-up trucks carrying 20 armed men while crossing the border from Iran into the Zirkoh area of Anadarah district, Farah province.

e.  **September 5, 2007**: NATO forces capture the 3rd largest Iranian weapons shipment to the Taliban of 2007, which comprised over 10 tons of armaments, including artillery shells, landmines, assault rifles, ammunition, EFPs and Chinese-made HN-5 anti-aircraft missiles.

f.  **September 22, 2007**: U.S. Central Command Commander Admiral William J. Fallon says amongst Iran's weapons supplies to the Taliban are EFPs, alike in Iraq. "The Iranians are clearly supplying some amount of lethal aid. There is no doubt… that agents from Iran are involved in aiding the insurgency."

g.  **November 2007**: U.S. Ambassador to Afghanistan, William Hood, issues a warning to Afghan President Karzai that Iran's support to the Taliban was becoming "increasingly lethal," according to a leaked cable revealed in December 2010.

h.  **January 2008**: An ANP raid captures 130 Taliban mines and IEDs, including 60 Iranian-made landmines, in a Taliban commander's resident in Anardara district in Farah province.

i.  **May 2008**: One Iranian male citizen and two Afghans were detained by the ANP as they attempted to enter the city of Naranj. The Iranian man carried video footage showing him providing military training to groups of Afghan men, suspected to be Taliban.

j.  **September 2008**: The *Daily Telegraph* interviews a Taliban commander who acknowledges having received Iranian-made EFPs from Iran, calling the devices 'Dragons' "because it's directional it causes heavy casualties." The same article

cited the UK's then Ambassador to Afghanistan asserting that the EFPs in question had been "donated by a group within the Iranian state."

k.  **March 2009**: Afghan security forces seized a Taliban arms cache containing Iranian-made explosives during a raid of the Bakhshabad Dam in Farah province.

l.  **May 2009**: Afghan security forces capture a large Taliban cache of Iranian-made and supplied weapons, including mortars and 44 'bricks of explosives' in Helmand province.

m.  **June 2009**: An Afghan border official reports the seizure of a shipment of Iranian anti-tank mines and mortars crossing into Afghanistan from Iran.

n.  **June 2009**: Senior Taliban commander and key Iranian proxy Mullah Mustafa was killed in a U.S. airstrike in Ghor province. The U.S. military subsequently described Mustafa as having had "connections to" the Qods Force.

o.  **August 2009**: A Taliban rocket attack targeting "Camp Stone" in Herat utilizes Iranian-made 107mm rockets, remnants of which contained Iranian lot numbers and shipment dates.

p.  **August 2009**: A Taliban commander cited in a U.S. intelligence report claimed to be in possession of six MANPADS, claiming they were provided by Iran, along with training in their use.

q.  **September 2009**: An ANP operation captures a series of 'jerrycans' filled with explosives thought to have emanated in Iran, concealed in a Taliban vehicle traveling on the Bagram-Kabul highway.

r.  **March 2010**: A Channel 4 News report from inside Afghanistan reveals a wide range of Iranian-made and Iranian-provided weapons captured from the Taliban by Afghan security forces, including mortars, plastic explosives, grenades, mines and explosives. Much of the weaponry had clear Iranian markings. Afghan government records seen by Channel 4 News revealed that more than 10.5 tons of weaponry had been captured by Afghan forces, in Herat, within the past 12 months – 60% of which had been of Iranian origin. The same report interviewed a Taliban commander in Kunduz, who claimed that "day by day, the Iranian border becomes more important for us," as international pressure against Pakistan was seeing Iran fill the gap of support to the Taliban.

s.  **October 2010**: A U.S. intelligence report written by the Theater Intelligence Group at Bagram Airbase (later revealed to media) asserted that the IRGC Qods Force was paying $1,000 to the Taliban in exchange for each U.S. soldier killed and $6,000 for each U.S. military vehicle destroyed. The report also claimed that the Iranian supply of surface-to-air missile systems and other weapons were being facilitated

by a former Afghan security official and that the IRGC was training groups of 10-20 Taliban fighters at a time, at various training facilities inside Iran.

t.   **February 2011**: UK military forces intercepted a shipment of Iranian rockets destined for the Taliban in Nimruz province. The forty-eight 122mm rockets were extended range systems, with a firing range of more than 20km – more than double the artillery rockets typically used by the Taliban. The rockets, being transported in pick-up trucks, were "recently manufactured" and had been "doctored and tampered with… but were of proven Iranian origin."

50.   Much of the weaponry provided to the Taliban by Iran contained clear markings identifying it as the product of the Iranian arms industry, but on occasion, such markings had been scratched away, or fabricated to appear to have originated elsewhere.

51.   Iran's intent was to enhance the Taliban's capacity to target U.S. and allied forces with more potent, more deadly and more reliable weapons systems, including IEDs and similar EFP and landmine systems.   That Iran was known to have offered bounties to the Taliban in exchange for killing U.S. servicemembers and destroying U.S. military vehicles is clear evidence of Iran's primary – deadly – objective.

52.   The continued ties between Iran and the Taliban through the years illustrates how the relationship is strategic and not merely a tactical dynamic limited in time.   The following events between 2013 and 2021 make this clear:

a.   **June 2013**: A Taliban delegation attend an Islamic "vigilance" conference in Tehran, at the invitation of the Iranian government. A series of bilateral meetings were subsequently held between Taliban and Iranian officials.

b.   **2013-2015**: Senior Taliban official Mohammed Tayeb Agha, based in the group's political office in Doha, Qatar, makes a series of visits to Tehran and emerges as the key point man for the Taliban's relationship with Iran.

c.   **June 2015**: A Taliban commander tells the *Wall Street Journal* that he was recruited by the IRGC while in Iran and now has a monthly $580 salary paid to him by the IRGC in exchange for his Taliban activities in Afghanistan. The commander said his unit's fighters are provided with 82mm mortars, light machine guns, assault rifles, rocket-propelled grenades and IED materials by Iran.

d. **February-April 2016**: Then Taliban leader Mullah Mohammed Mansour makes three consecutive visits to Iran; one in February, one in March and one in April – allegedly in part for meetings with the Iranian government. He was killed in a U.S. drone strike on his return to Afghanistan after the third visit, on May 21.

e. **November 2017**: The governor of Afghanistan's Farah province claims publicly that the IRGC had established additional training camps for Taliban personnel on Iranian soil – in Birjand, South Khorasan province, and in an undisclosed areas of Khorasan-e Razavi province.

f. **May 2018**: The Taliban launch a major assault on the provincial capital of Farah province, in an operation that the Afghan military claim involved IRGC personnel on the ground, as well as Iranian weapons supplies. Months later, during a visit to Tehran, Ali Shamkhani, the secretary of Iran's Supreme Council for National Defense, was pressed on the issue by Afghan officials and in response, he reportedly failed to deny the accusation, only sharing *his* concerns about the city's heavy U.S. intelligence presence in the city, which he claimed was directed at surveilling Iran.

g. **October 2018**: The U.S. Treasury Department and six other allied nations (collectively known as the Terrorist Financing Targeting Center) issued sanctions on two IRGC Qods Force officers – Mohammad Ebrahim Owhadi and Esma'il Razavi – for their alleged provision of financial and military support to the Taliban in Afghanistan. In the accompanying statement, the U.S. Treasury said Owhadi negotiated an agreement with the Taliban's Shadow Governor in Afghanistan's Herat province to fund and arm his fighters, as well as provide them training at IRGC Qods Force facilities in Birjand. The statement further claimed that Razavi had been responsible for running an IRGC Qods Force training facility for Taliban fighters operating in Helmand, Farah, Ghor and Badghis provinces.

h. **November 2019**: A U.S. Defense Intelligence Agency (DIA) report on Iran concludes that the IRGC Qods Force continued to "provide material support to the Taliban" and had done since 2007. That support, according to the DIA, "has consisted of small-arms, explosives, mortars, RPGs, heavy machine guns, and 107mm rockets, in addition to training in small unit tactics and the use of weapons systems."

i. **August 2020**: U.S. intelligence concludes that the IRGC Qods Force had offered bounties to the Taliban in exchange for killing U.S. soldiers in Afghanistan and identified payments made in relation to six deadly attacks in 2019.

j. **Late-2021**: In the wake of the U.S. withdrawal from Afghanistan and the swift return of the Taliban to power, Iranian President Ebrahim Raisi proclaimed that events represented a chance for "peace and security." The conservative Iranian newspaper *Kayhan*, close to the IRGC, began referring to Taliban-run Afghanistan as a member of Iran's regional 'Axis of Resistance.' Ali-Akbar Veleyati, veteran

16

Iranian national security figure and senior advisor to the Supreme Leader similarly proclaimed Afghanistan to have joined the 'axis' in comments in late-2021. When the Taliban announced the formation of their new government, the deputy minister of defense, Mullah Abdul Qayyum Zakir, and deputy minister of interior, Mullah Sadr Ibrahim, were both well-known figures with years of close ties to Iran, having led parts of the Taliban enjoying substantial Iranian support.

53.     Recent years have revealed greater information about the depth of the Taliban-Iran relationship.  Militarily, it was discovered that the IRGC was operating at least four training camps on Iranian soil for Taliban militants – outside the capital Tehran, and in Mashhad, Zahedad and Kerman.  Mashhad in particular emerged as the central headquarters of the relationship, with a de facto Taliban office operating from there that some nicknamed the "Mashhad Shura" in a reflection of its perceived strategic significance.

### C.  The Taliban Injured Plaintiffs with the Material Support of Iran

54.     Plaintiffs are members of the U.S. military, and their family members, who were injured in terrorist attacks perpetrated by the Taliban in the year 2010 in the Helmand province, and the years 2012 and 2013 in the Wardak province, in Afghanistan, through the material support of Iran.

55.     The Taliban's principal goal has long been to expel Coalition forces, particularly Americans, from the country and undermine the elected government of Afghanistan.  To that end, the Taliban began to ramp up its terrorist attacks on U.S. forces in Afghanistan during the mid-2000s.  The Taliban started using new attack types, including suicide bombings in Afghanistan in 2004.  Remotely detonated bombings more than doubled between 2005 and 2006.

56.     In early 2007, ISAF forces, principally British, launched a successive series of planned offenses against the Taliban in the Helmand province which successfully suppressed overt Taliban control, but failed to impose any meaningful defeats.

57.     In May 2007 Senior Taliban leader Mullah Dadullah was killed in a U.S. Special Operations Forces operation in the Helmand province.

58.     In 2008 and 2009, a growing Taliban insurgency attacked U.S. forces throughout Afghanistan with a particular emphasis on the southern provinces of Afghanistan, especially Helmand and Kandahar provinces.

59.     In May 2009, Afghan security forces captured a large Taliban cache of Iranian-made and supplied weapons, including mortars and 44 bricks of explosives in the Helmand province.

60.     By 2010, the Taliban had regained much of the territory it had lost after 9/11. Responding to the Taliban's growing threat, U.S. marines launched counterinsurgency operations. The Taliban, in turn, responded with escalating violence.

61.     In 2010 the Taliban escalated its nationwide insurgency "dramatically" with between 1,000 and 1,500 attacks recorded each month for half of the year.  The Taliban's use of Iranian made and/or supplied terrorism IEDs increased markedly.  The number of U.S. military servicemembers suffering amputations from IED attacks in 2010 rose by 128% from 2009.

62.     Plaintiff Corbin McClanahan was injured in five separate IED attacks between April 2010 and August 2010 in the Helmand province in Afghanistan.  At the time of the attacks, the Taliban held a dominant position there.

63.     In late 2012, the Taliban was engaged in a years-long, unprecedented offensive campaign targeting the U.S., NATO allies and the Afghan government and associated forces.  The Taliban was in de facto control of the Wardak province (including the Jalrez district) and intensifying its attacks methodically in an attempt to induce a full U.S. withdrawal from the province, which began in 2012 and was completed in 2015.

64.     Deep buried IEDs were a weapon and tactic frequently employed by the Taliban, and IEDs in general were extremely common.  In Wardak and Jalrez specifically, the Taliban was known to employ multiple IEDs on the main highway in the province and on smaller roads on a near-daily basis.

65.     Plaintiffs Seth Nieman, Nate Schuler and Cody Vertz were attacked by a deep buried IED and machine gun fire in the Jalrez district of the Wardak province in Afghanistan on or about November 27, 2012. Plaintiff Owen Lawlor was attacked by machine gun fire in the Wardak province of Afghanistan on or about October 5, 2012, and March 11, 2013.  At the time of the attacks, the Jalrez district and Wardak were both long-standing strategic strongholds for the Taliban, but also a region of great military importance given their proximity to Kabul and the location of key roadways running between Afghanistan's biggest cities and the capital.

66.     The Iranian government, and specially the IRGC-QF, was both opposed to the U.S.-led presence in Afghanistan and engaged in meaningful and well-documented relationship with the Taliban, which included the provision of weapons, military supplies and training.  Iran's goals in supporting the Taliban were directly squarely at attacking and killing U.S. soldiers – going so far as offering and paying bounties for such attacks.

67.     Like the Taliban, Iran was fully aware of the U.S.' largely failed surge in Afghanistan and of broader speculation and moves aimed towards initiating negotiations between the Taliban and both Kabul and the U.S.  After several years of unprecedented Taliban violence and U.S. losses, Iran was unquestionably cognizant of the opportunity to press ahead, sustaining attacks on U.S. forces and seeking to force their submission to talks.  In the Helmand and Wardak provinces specifically, Iran would have been highly aware of the Taliban's de facto control.

68.     The duration, quantity and quality of material support from Iran greatly contributed to the Taliban's ability to carry out these terrorist attacks.  The Taliban could not have carried out these lethal attacks without the material support of Iran.  Iran knew and intended that the Taliban would continue to carry out further terrorist attacks.  Iran's provision of material support or resources to the Taliban caused plaintiffs' injuries.

**COUNT I**
**BATTERY**
**By Surviving Injured Plaintiffs**
**(Under 28 U.S.C. § 1605A(c))**

69.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

70.     The Taliban, with the material support of Defendant Iran, willfully, intentionally, violently and forcefully committed IED and machine gun terrorist attacks against the Surviving Injured Plaintiffs.

71.     These willful, wrongful and intentional acts constituted a violent battery upon the Surviving Injured Plaintiffs and caused physical injury to them.

72.     As a direct and proximate result of the willful, wrongful and intentional acts of the Taliban, with the material support of Defendant Iran, each and every one of the Surviving Injured Plaintiffs were damaged in that they endured physical injury, pain and suffering, mental anguish, and past and future economic losses including lost income, and loss of earning capacity.

73.     Defendant's conduct in providing material support to the Taliban for the IED and machine gun terrorist attacks was outrageous, criminal, malicious, willful, and wanton in its reckless indifference to human life and the rights of others, a threat to public safety and international peace and security, and in violation of fundamental norms of international law, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## COUNT II
## ASSAULT
### By Surviving Injured Plaintiffs
**(Under 28 U.S.C. § 1605A(c))**

74.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

75.     During the Taliban's IED and machine gun terrorist attacks, with the material support of Defendant Iran, the Taliban intentionally and willfully acted to cause harm to the Surviving Injured Plaintiffs, thereby putting them in fear for their lives and in imminent apprehension of harm and injury, or intended to put the Surviving Injured Plaintiffs in imminent apprehension of such contact, as a direct result of the terrorist's actions.

76.     As a direct and proximate result of the willful, wrongful, and intentional act of the Taliban, with the material support of Defendant Iran, each and every one of the Surviving Injured Plaintiffs were injured in that they endured imminent apprehension of harm, extreme mental anguish, physical injury, pain and suffering, and past and future economic losses including lost income, and loss of earning capacity, all to their damage.

77.     Defendant's conduct in providing material support to the Taliban for their IED and machine gun terrorist attacks was outrageous, criminal, malicious, willful, and wanton in its reckless indifference to human life and the rights of others, a threat to public safety and international peace and security, and in violation of fundamental norms of international law, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### By Surviving Injured Plaintiffs
**(Under 28 U.S.C. § 1605A(c))**

78.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

21

79.     The actions of Defendant Iran of providing material support to the Taliban, causing the IED and machine gun terrorist attacks, constitutes extreme and outrageous conduct intended to cause the Surviving Injured Plaintiffs severe emotional distress.

80.     The actions by Defendant Iran were undertaken deliberately, intentionally, willfully, maliciously, wantonly and recklessly, with knowledge that the IED and machine gun terrorist attacks would cause severe emotional distress to the Surviving Injured Plaintiffs.

81.     The actions of Defendant Iran did in fact cause the IED and machine gun terrorist attacks and subsequently was the cause in fact of the Surviving Injured Plaintiffs suffering severe emotional distress.

82.     As a direct consequence of the actions of Defendant Iran, the Surviving Injured Plaintiffs suffered severe emotional distress, extreme mental anguish, shock, psychological injuries, and past and future economic losses including lost income, and loss of earning capacity.

83.     Defendant Iran, by engaging in this intentional, extreme, outrageous, reckless and unlawful conduct, intentionally and recklessly inflicted severe emotional distress upon the Surviving Injured Plaintiffs.

84.     Defendant's conduct in providing material support to the Taliban for the IED and machine gun terrorist attacks was outrageous, criminal, malicious, willful, and wanton in its reckless indifference to human life and the rights of others, a threat to public safety and international peace and security, and in violation of fundamental norms of international law, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

### COUNT IV
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### AND LOSS OF SOLATIUM
### By Immediate Family Members of Surviving Injured Plaintiffs
### (Under 28 U.S.C. § 1605A(c))

85.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

86.     The actions of Defendant Iran of providing material support to the Taliban to carry out the IED and machine gun terrorist attacks constitutes extreme and outrageous conduct intended to cause severe emotional distress to the plaintiffs who are immediate family members of the Surviving Injured Plaintiffs.

87.     The actions by Defendant Iran were undertaken deliberately, intentionally, willfully, maliciously, wantonly, and recklessly, with knowledge that the IED and machine gun terrorist attacks would cause severe emotional distress to the immediate family members of the Surviving Injured Plaintiffs.

88.     The actions of Defendant Iran did in fact cause the IED and machine gun terrorist attacks and subsequently was the cause in fact of the plaintiffs' severe emotional distress.  As a direct consequence of the actions of Defendant Iran, the plaintiffs who are immediate family members of the Surviving Injured Plaintiffs have suffered severe emotional distress, shock, extreme mental anguish, pain and suffering, loss of solatium, and loss of society and companionship.

89.      Defendant, by engaging in this intentional, extreme, outrageous, reckless and unlawful conduct, intentionally and recklessly inflicted severe emotional distress upon plaintiffs.

90.     Defendant Iran's conduct in providing material support to the Taliban for the IED and machine gun terrorist attacks was outrageous, criminal, malicious, willful, and wanton in its

23

reckless indifference to human life and the rights of others, a threat to public safety and international peace and security, and in violation of fundamental norms of international law, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## COUNT V
## PUNITIVE DAMAGES
### by All Plaintiffs
### (Under 28 U.S.C. § 1605A(c))

91.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

92.     Defendant Iran's conduct was outrageous in the extreme; wanton, willful and malicious and constituted a threat to the public at large, warranting an award of punitive damages in an amount sufficient to punish Defendant Iran and deter it and others from similar future wrongful conduct, pursuant to 28 U.S.C. § 1605A(c).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court grant judgment in their favor against Defendant Iran and grant plaintiffs:

A.  Compensatory damages against Defendant Iran in the amount of no less than SEVENTY MILLION DOLLARS ($70,000,000);

B.  Punitive damages;

C.  Pre-judgment interest;

D.  Post-judgment interest;

E.  Reasonable costs and expenses;

F.  Reasonable attorney's fees; and

G.  Such other and further relief as the Court may determine to be just and equitable in the circumstances, including but not limited to leave of court to amend this Complaint as the interest of justice requires.

Respectfully submitted,


Date: September 28, 2022

_____*/s/ Joshua M. Ambush*_
Joshua M. Ambush
Bar No. MD27025
Law Offices of Joshua M. Ambush, LLC
106 Old Court Road, Suite 303
Baltimore, Maryland 21208
Phone: (410) 484-2070
Facsimile: (410) 484-9330
joshua@ambushlaw.com